Filed 5/12/20

# CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VVA-TWO, LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br> IMPACT DEVELOPMENT<br> GROUP, LLC,<br><br>    Defendant and Respondent. | B291330<br><br>(Los Angeles County<br>Super. Ct. No. BC548740) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed.

Glaser Weil Fink Howard Avchen & Shapiro, Michael Cypers; Greines, Martin, Stein & Richland, Robin Meadow and Jeffrey E. Raskin for Plaintiff and Appellant.

Shaw Koepke & Satter and Jens B. Koepke for Defendant and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion *post*, part B.3.

Efficiency, finality, and restricted appellate review are the hallmarks of arbitration under California law, and thus often the impetus for parties to enter into an arbitration agreement. Absent party agreement providing otherwise, the Code of Civil Procedure reflects those goals by limiting the bases for vacatur of an arbitration award to a short list of situations in which the award reflects not legal or factual error, but some flaw in the arbitral proceedings or award rendering them fundamentally unfair or unauthorized. (See Code Civ. Proc.,[1] § 1286.2; see also § 1283.4.) We disagree with appellant VVA-TWO, LLC (VVA) that the award underlying this appeal presents any such basis for vacatur.

VVA appeals from a judgment resulting from the court's confirmation of an arbitration award in favor of Impact Development Group, LLC (IDG) regarding a contractual dispute between the parties. VVA presents three arguments for vacatur, none of which we find persuasive. In considering these arguments, we are guided by the general policy in favor of arbitration and, more specifically, in favor of interpreting arbitration awards to give effect to parties' stated desire to avoid court involvement.

VVA first argues that the arbitrator exceeded his authority by awarding IDG remedies that are inconsistent with the contract. But where, as here, the arbitration agreement does not expressly prohibit the specific remedies awarded by the arbitrator, California Supreme Court precedent requires only a rational relationship between the arbitrator's interpretation of the contract and the remedies awarded—nothing further.

---

[1] Further statutory references are to the Code of Civil Procedure.

2

Ours is not to assess the merits of the arbitrator's contractual interpretation, even if, as VVA argues is the case here, it is inconsistent with the plain terms of the contract. The remedies the arbitrator awarded here bear a rational relationship to the arbitrator's interpretation of the contract, which we infer from the terms of the award itself and the record more generally. The arbitrator thus did not exceed his authority in awarding this remedy.

We also disagree with VVA's argument that the award is incomplete. Under the circumstances that existed at the time the arbitrator signed the award, it finally resolved all issues between the parties. Events that might—but are not necessarily likely to—happen in the future could render the remedy incremental, but the arbitrator retained jurisdiction to implement those potentially incremental terms, should such hypothetical events materialize.

As to VVA's third argument, in the unpublished portion of this opinion, we conclude that the arbitrator's assessment of certain evidence as irrelevant and his resulting refusal to reopen proceedings to admit such evidence do not render the arbitration process fundamentally unfair.

Thus, the trial court correctly confirmed the award.

## BACKGROUND AND PROCEDURAL SUMMARY

### A. <u>The Contracts Underlying This Dispute</u>

This litigation is part of a larger set of disputes between Gary Downs, William Rice, Douglas Day, and Kristoffer Kaufmann stemming from their ownership of a low income housing development entity called Highland Property Development, LLC (Highland).[2]  One such dispute arose between Day, Downs, and Rice regarding Highland's efforts to acquire two low-income housing projects, Villa Vasona and Twin Oaks. To resolve this dispute, Day, Downs, and Rice agreed that appellant VVA, a housing development entity owned by Rice and Day, would acquire the two housing projects and assign a one-third economic interest in them to respondent IDG, a housing development entity owned by Downs.

IDG and VVA memorialized their agreements regarding the housing projects on February 1, 2013 with a complex set of contracts that included, among other documents, a set of substantively identical agreements the parties refer to as Distributable Cash Agreements (DCAs) and a set of limited partnership agreements (LPAs).  Pertinent to the matter before us, each of the DCAs contains an arbitration clause and, as an

---

[2] Neither Highland, nor any of its individual members, is a party to this appeal.  More background regarding the dispute underlying this appeal and related disputes involving individual Highland partners, can be found in our opinions in *Rice v. Downs* (2016) 248 Cal.App.4th 175 (*Downs I*) and *Rice v. Downs* (Jul. 23, 2019, B286296) [nonpub. opn.] (*Downs II*).  The background provided in these opinions is not necessary to an understanding of the issues here.

4

amendment to the Highland operating agreement, a "Mandatory Buy-Sell of Membership Interests" clause, and a "Limitation of Buy-Sell Rights" clause.[3]  (Underlining omitted.)

The DCAs defined various events as "Buy-Sell Events" that could trigger the agreements' buy-sell provisions.  On the occurrence of a "Buy-Sell Event," either IDG or VVA could invoke the buy-sell provisions by sending a buy-sell notice to the other party.  The notice was to contain "the terms and conditions for the Offering Party's purchase of the [i]nterests of the other party . . . (the 'Non-Offering Party')."  Upon delivery of a buy-sell notice, the contracts gave the other party—the Non-Offering Party—the option to purchase the Offering Party's interest "on the same terms and conditions set forth in the Buy-Sell Notice

---

[3] The "Limitation of Buy-Sell Rights" clauses stated: "Notwithstanding anything to the contrary set forth herein, no party shall have the right to exercise the Mandatory Buy-Sell if the exercise of the Mandatory Buy-Sell and/or the consummation of the transactions contemplated thereby would result in a breach of any agreement to which the Project, the [project partnership] and/or the [project co-general partner] are a party or subject to, including, without limitation, the [project] Partnership Agreement[s].  Notwithstanding the foregoing, the exercise and consummation of the rights under the Mandatory Buy-Sell shall be subject to (i) any consent rights of an Investor Limited Partner under the [project] Partnership Operating Agreement, and (ii) any consent or approval rights of any other third party if required under their documents, the [project] Partnership, and/or the [project co-general partner] Operating Agreement, including, but not limited to, any secured lender of the Project, the federal department of Housing and Urban Development, CBRE HMF, Inc., and the California Tax Credit Allocation Committee."  The DCAs designated RBC Tax Credit Equity, LLC (RBC) as the "Investor Limited Partner."

of the Offering Party" by giving the Offering Party notice of the election to exercise the option within 30 days after delivery of the buy-sell notice. The contracts also provided that "[t]he closing . . . of the purchase and sale of any [i]nterest pursuant to this Mandatory Buy-Sell shall take place on the conditions and date identified in the Buy-Sell Notice delivered by the Offering Party, but not later than ninety (90) days after the delivery of the Buy-Sell Notice."

The agreements reference several third party lenders and investors, often referred to as "special" or "limited" "partner[s]." For example, the DCAs designate RBC Tax Credit Equity, LLC (RBC) as the "Investor Limited Partner" as well as the Special Limited Partner. Neither RBC, nor any other such "partner" or investor is a party to the arbitration, arbitration agreement, or this appeal.

The agreements create a role for RBC and other third party partners in consummating transactions resulting from a "Buy-Sell Notice" (buy-sell transactions). First, the LPAs provide that VVA could "withdraw from the Partnership or sell, transfer or assign its Interest as General Partner"—including via a buy-sell transaction—"only with the prior Consent of the Special Limited Partner [RBC] in its sole discretion, and of the Agency and the Project Lenders, if required." The "Limitation of Buy-Sell Rights" clauses in the LPAs reinforce that "the exercise and consummation of the rights under the Mandatory Buy-Sell shall be subject to (i) any consent rights of an Investor Limited Partner under the [project] Partnership Operating Agreement, and (ii) any consent or approval rights of any other third party if required under their documents, the [project] Partnership, and/or the [project co-general partner] Operating Agreement,

6

including, but not limited to, any secured lender of the Project, the federal department of Housing and Urban Development, CBRE HMF, Inc., and the California Tax Credit Allocation Committee."[4]

### B.    The Buy-Sell Transaction at Issue

On February 17, 2014, IDG sent VVA a letter indicating that a buy-sell event had occurred and that IDG was invoking the DCAs' mandatory buy-sell provisions.  For each of the projects, IDG specified the closing would occur on the "[l]ater of 90 days following the date of this Buy-Sell Notice or receipt of [the] last of consents required under [each respective project's] Operating Agreement"—i.e., the consent of third party investors and partners, such as RBC, as outlined in the provisions discussed above.  On March 18, 2014, VVA responded with a notice of election to purchase IDG's interests in the projects.

On June 16, 2014, VVA filed a complaint against IDG alleging IDG had breached the contract created by the DCAs, IDG's buy-sell notice, and VVA's notice of its election to purchase IDG's interests in the two projects.  Specifically, VVA claimed that IDG breached by refusing to execute closing documents and by refusing to transfer its interests in the projects to VVA.

---

[4] Additional provisions indirectly have the same effect, including a provision that "no party shall have the right to exercise the Mandatory Buy-Sell if the exercise of the Mandatory Buy-Sell and/or the consummation of the transactions contemplated thereby would result in a breach of any agreement to which the Project, the [project partnership] and/or the [project co-general partner] are a party or subject to, including, without limitation, the [project] Partnership Agreement."

## C. The Parties' Arbitration Agreement

The DCAs' arbitration clauses read: "Any dispute or controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in San Francisco or Los Angeles, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law."

In July 2014, after VVA filed its complaint, Downs, Day, Kaufmann, Rice, VVA, and IDG entered into a global arbitration agreement intended to direct all of the parties' disputes into a single arbitration proceeding. Part of that agreement modified the DCAs' arbitration clauses to reflect the parties' agreement to allow "all contemplated claims between and among them . . . [to] be submitted to JAMS in Los Angeles, California for arbitration before a single arbitrator." The agreement expressly modified the DCAs' arbitration clauses "in no other respect." The parties stipulated to stay the court case pending arbitration, and the trial court entered the stay order on August 27, 2014.

## D. Arbitration Proceedings

In August 2014, IDG moved the arbitrator for an order severing IDG's and VVA's mutual claims regarding the DCAs'

8

buy-sell provisions and to accelerate a hearing on those claims. The arbitrator granted IDG's motion and left the parties' remaining claims (including claims involving Kaufmann and disputes related to *Downs I* and *Downs II*) to proceed on a different track.

The arbitration hearing on IDG's and VVA's severed claims was held in November and December 2016 and January 2017. VVA and IDG presented competing claims that the other party breached. Both claims of breach depended on the parties' respective interpretations of certain terms in the contract.[5]

IDG and VVA both requested the arbitrator award specific performance as the remedy for their respective claims of breach. At the hearing, the parties discussed with the arbitrator the third party consent provisions in the DCAs, including how these provisions might affect the arbitrator's ability to grant specific performance. For example, the arbitrator asked what would happen if a third party partner, such as RBC, "refuses" to consent to the transaction, and how "that [would] affect a specific performance remedy."

---

[5] Specifically, VVA claimed that IDG breached by refusing to execute closing documents and by refusing to transfer its interests in the projects to VVA. IDG claimed VVA breached by failing to pay the purchase price and demanding that IDG assign its interests before paying this amount. Although the buy-sell notice was silent on the sequence of payment and assignments of interest, the DCAs provide that the seller shall execute and deliver assignments of interest "upon payment of the purchase price." The parties' arguments derived largely from a dispute regarding the meaning of "upon."

### E. Relevant Arbitration Awards and Orders

#### 1. *February 2017 Interim Award*

On February 23, 2017, the arbitrator issued an interim award.  The interim award identified the "core legal determination" in the arbitration as "which [p]arty breached the Buy-Sell Agreement."  The arbitrator found VVA had breached that agreement by demanding new and different terms beyond those contained in the buy-sell notice.  The award concluded that "[t]he evidence is overwhelming that it was VVA that breached the Agreement, not IDG," and, accordingly, decided both parties' respective claims in IDG's favor.

During arbitration, IDG had proposed a remedy, a portion of which the interim award adopts.  Specifically, the interim award provides that "IDG may enforce the DCAs as the buyer of VVA's [i]nterests, effective as of May 19, 2014," and that "IDG may file a post-[h]earing motion for attorneys' fees and costs."  As to IDG's request that the arbitrator "require[ ] VVA to pay IDG 100 [percent] of the Distributable Cash accrued since May 19, 2014 and [one-third] of the Distributable Cash accrued before May 19, 2014" and "enjoin[ ] VVA from taking any further distributions," the interim award notes that a final award, to be issued within a certain time frame, "will address IDG's request regarding [cash] distributions" as another component of the remedy for VVA's breach of contract.

#### 2. *Order Denying Motion to Reopen Proceedings*

On April 13, 2017, VVA filed a motion to reopen the arbitration, citing newly discovered evidence related to Downs's credibility.  VVA argued, inter alia, that this evidence warranted

reopening proceedings, because the arbitrator had relied heavily on Downs's and Rice's respective credibility in making its decision. Namely, the arbitrator's interim award noted: "The most important witnesses were Downs and Rice. They are the principals of the [p]arties. Each engaged in the critical conduct that is in dispute. Not surprisingly, their testimony conflicts on significant matters. Consequently, evaluation of their respective credibility is a significant factor in deciding this case."

The arbitrator denied VVA's motion on the basis that "[t]he evidence which VVA seeks to present at a re-opened [h]earing is wholly collateral to what the parties contested in this Arbitration"—the meaning, performance, and breach of the buy-sell agreement—and that "[w]hether Downs violated the Rules of Professional Responsibility or certain criminal statutes is not for the Arbitrator to decide."

The arbitrator further noted that "even if VVA's proffered evidence had been presented at the [h]earing, the Arbitrator would have sustained IDG's inevitable relevance objection."

### 3. *May 2017 Partial Final Award*

The arbitrator issued a "partial final award" on May 19, 2017, in favor of IDG.[6] The award contained the same language and findings as the interim award regarding VVA being the sole party in breach, and Downs's and Rice's credibility.

Regarding the appropriate remedy, the arbitrator noted that it was "telling that the parties agree that specific performance of the Buy-Sell is the appropriate way to remedy the other's breach. Since VVA did not effect a purchase and

---

[6] The award is "partial" because it leaves intact claims severed from the parties' dispute here.

11

thereby breached the DCAs and the Buy-Sell, *the only remaining option consistent with the DCAs is to order VVA to sell its [i]nterests to IDG on the terms and conditions set forth in the Buy-Sell, effective on the May 19, 2014 closing date*." (Italics added.)

Accordingly, the award provided, inter alia, that "IDG may enforce the DCAs as the buyer of VVA's [i]nterests, effective May 19, 2014," which the arbitrator concluded to be the "Buy-Sell closing date . . . when IDG is deemed to have purchased VVA's [i]nterests"; and that "VVA shall immediately pay IDG 33.3 [percent] of Distributable Cash that accrued prior to May 19, 2014 and all Distributable Cash that has accrued since May 19, 2014." To determine the amount of Distributable Cash, the partial final award also required VVA, upon written demand from IDG, to provide IDG with "an accounting of its receipt, disbursement and retention of Distributable Cash from February 21, 2013 to the present." The partial final award thus contemplated further proceedings for the purpose of calculating the specific amount of damages VVA was to pay IDG under the award, a calculation for which the arbitrator required additional, updated information.

On July 11, 2017, IDG petitioned the trial court for an order confirming the arbitrator's award.

On July 24, 2017, VVA filed a petition to vacate the award.

### 4. *August 2017 Order Regarding Determination of Distributable Cash*

With the petitions to vacate/confirm still pending before the trial court, IDG provided VVA with the requisite written demand for accounting. As contemplated in the partial final award, the

12

arbitrator held further proceedings to calculate the exact amount VVA owed IDG.

In the August 25, 2017 "Order re[garding] Determination of Distributable Cash" (boldface and capitalization omitted), the arbitrator set forth the specific amount owed by VVA, taking into account arguments regarding taxes and prejudgment interest. In addition, the arbitrator noted as follows regarding his continuing jurisdiction over the dispute:

"The Arbitrator will continue to retain jurisdiction over the bifurcated portion of this arbitration that was the subject of the Partial Final Award for the sole purpose of ensuring that the Buy-Sell transaction occurs as directed in the Partial Final Award. Although the Partial Final Award did not address the retention of jurisdiction, both parties have availed themselves of the Arbitrator's authority consistently since issuance of that [a]ward to resolve disputes regarding the accounting, a determination of the amount of distributable cash and VVA's interim management of the Projects. VVA did not object to these proceedings on any ground, including that the Arbitrator lacked jurisdiction. However, in light of a hearing regarding the parties' cross-motions to confirm or set aside the Partial Final Award . . . the undersigned Arbitrator will stay the effectiveness of this [o]rder to retain jurisdiction until a further hearing before the undersigned. VVA requested further briefing on this issue. The Arbitrator reserves judgment on that request until after the [trial court] rules on the cross-motions [to vacate and confirm]."

### F. Trial Court Proceedings

#### 1. *Request for Clarification from Arbitrator*

The trial court heard the parties' competing petitions on September 1, 2017. On September 11, 2017, the court issued an order for the parties to "return to the arbitrator . . . to obtain clarification of the May 19, 2017 partial final award." (Capitalization omitted.)

In a written "Response to Court Minute Order [regarding] Clarification of Partial Final Award" (boldface and capitalization omitted), the arbitrator wrote that "[n]either the Minute Order nor the transcript of the hearing specifically identified any particular issue to be clarified," and that the parties' briefing to the arbitrator in the wake of the court's request reflected the parties likewise were unsure of what issues were to be clarified. Finally, the arbitrator found it "[n]otabl[e]" that the parties "agreed that no clear authority exists whether an arbitrator has the authority to clarify an arbitration award." On these bases, "[t]he Arbitrator decline[d] to respond to the Minute Order at th[e] time," but noted that, "should the Court expressly order the Arbitrator to clarify any aspect(s) of the Partial Final Award, the Arbitrator [would] do so within the scope of the authority granted to the Arbitrator by the Court."

#### 2. *Order Confirming Award*

The trial court heard further argument on February 26, 2018. On April 12, 2018, it issued an order confirming the arbitration award. The trial court concluded that the remedies in the arbitrator's award "appear rationally related to both the contract and to VVA's breach" and that the arbitrator had "not exceed[ed] his authority in awarding any of the specified

14

remedies." Finally, the court noted that the "suggestions that VVA was 'substantially prejudiced' because [the arbitrator] made material credibility calls involving parties or witnesses, or both, is not a basis for a review by this Court." In short, the court concluded, "[t]he arbitrator did his job and [VVA] lost, and th[e] Court's observation that the findings and the [a]ward could logically result in more than one possible scenario (based on options and interests IDG or other parties may elect based on [the arbitrator's] findings), is not a ground to vacate the award under . . . [section] 1286.2." On May 7, 2018, the trial court entered judgment for IDG based on the arbitration award.

VVA filed a timely notice of appeal from that judgment, a subsequent order denying VVA's motion to vacate or correct the judgment, and "all orders made final and appealable by either the judgment or the . . . order."

As of the date of the parties' argument before this court, IDG had obtained all necessary third party consents except that of RBC. With respect to RBC, IDG had provided a significant amount of due diligence materials to RBC at the latter's request, made a formal request for RBC's consent, and paid RBC certain fees to fund RBC's diligence efforts.

## DISCUSSION

Our review of the trial court's judgment and orders is de novo. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9 (*AMD*).) Both our review and the trial court's review of the arbitrator's award, however, are limited, as discussed in more detail below. (*Id.* at pp. 376, fn. 9 & 381.)

### A.   A Court's Limited Role in Reviewing Arbitration Awards

Under California law, the scope of judicial review of arbitration awards is very narrow. (*Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1365; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10 (*Moncharsh*) ["arbitrator's decision should be the end, not the beginning, of the dispute"].) Consistent with this limited role, a court may vacate an arbitral award only on certain statutorily enumerated grounds. (*Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1433 (*Hightower*).) These are laid out in the Code of Civil Procedure, and reflect not error in the merits of the decision, but " 'circumstances involving serious problems with the award itself, or with the fairness of the arbitration process.' " (*Id.* at pp. 1432–1433.) The situations in which the code provides a basis for vacatur include when:  (1) the award fails to fully "determin[e] . . . all the questions submitted to the arbitrators[,] the decision of which is necessary in order to determine the controversy" (§ 1283.4; see *M. B. Zaninovich, Inc. v. Teamster Farmworker Local Union 946* (1978) 86 Cal.App.3d 410, 415 (*Zaninovich*)); (2) "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted" (§ 1286.2, subd. (a)(4)); and (3) "[t]he rights of the party were substantially prejudiced by

16

the refusal of the arbitrators . . . to hear evidence material to the controversy." (§ 1286.2, subd. (a)(5).)

A court may vacate only an *entire* arbitral award, not some portion of it, even if the basis for vacatur affects only one aspect of the award. This is because partial vacatur could effectively revise the merits of an overall award, in violation of the principles discussed above. Similarly, courts may not "correct[ ]" an arbitral award in any way that "affect[s] the merits" of the decision upon the controversy submitted. (§ 1286.6, subds. (b) & (c); see *id.*, subd. (a).)

## B. There Is No Basis for Vacating the Award

VVA raises three arguments as to why the trial court erred when it confirmed the arbitration award. We address each in turn below, and conclude that none of them provides a basis for vacatur.

### 1. *The Award Is Not Incomplete or Uncertain for Failure Expressly to Address Third Party Consent*

VVA argues that, because the award fails to expressly address the question of third party consent, an issue "necessary in order to determine the controversy," the award is incomplete and must be vacated. (See § 1283.4; *Zaninovich, supra,* 86 Cal.App.3d at p. 415.) We disagree.

The parties submitted two questions to the arbitrator: (1) which party breached the DCAs, and (2) what specific performance remedy should be awarded as a result. The arbitrator has provided a final answer to both of these questions. In this respect, the award is distinguishable from the award in *Zaninovich,* on which VVA relies, because in that case, "the

17

submission agreement expressly required a determination of 'how much . . . is owing,' " leading the court to conclude that "the failure to state the amount is a failure to find upon an issue submitted to the arbitrator." (*Zaninovich, supra*, 86 Cal.App.3d at p. 415.)

Of course, the arbitrator's inability to know whether all third party partners would consent to the buy-sell transaction complicated the specific performance issue submitted by the parties. But we understand the partial final award as working around this complication by: (1) awarding IDG the right to "enforce the DCAs as the buyer of VVA's [i]nterests, effective as of May 19, 2014," and (2) retaining jurisdiction to address any issues that might arise in the process—including IDG's failure to obtain third party consent, should that occur. The arbitrator confirmed such reservation of jurisdiction when he noted in his August 2017 order that he "continu[ed] to retain jurisdiction over . . . the subject of the Partial Final Award for the sole purpose of ensuring that the Buy-Sell transaction occurs as directed in the Partial Final Award." Therefore, the award does not fail to address a situation in which a third party investor withholds consent, and the arbitrator "has not improperly left undecided issues 'necessary in order to determine the controversy.' " (*Hightower, supra*, 86 Cal.App.4th at p. 1439; see *AMD, supra*, 9 Cal.4th at p. 372 ["[I]t is for the arbitrators to determine what issues are 'necessary' to the ultimate decision."].)

Rather, the award provides a complete but potentially incremental remedy tailored to address a challenging situation. (See *Hightower, supra,* 86 Cal.App.4th at pp. 1419 & 1439, citing *Morris v. Zuckerman* (1968) 69 Cal.2d 686, 690 (*Morris).*) "[S]uch [an] incremental award process . . . is within the 'broad scope' of

an arbitrator's authority to fashion an appropriate remedy. It is not precluded by nor offensive to the California Arbitration Act." (*Hightower*, *supra*, 86 Cal.App.4th at p. 1419; *Jones v. Kvistad* (1971) 19 Cal.App.3d 836, 843.) "Nothing remains to be resolved except those potential and conditional issues that necessarily could not have been determined . . . when the Partial Final Award was issued," given that the arbitrator could not know whether all third parties would consent.[7] (*Hightower, supra*, 86 Cal.App.4th at p. 1439.)

The record supports our understanding of the award as potentially incremental in this manner. There was no need for the arbitrator to address third party consent at the time of the partial final award, because, at that point, it was only a theoretical possibility that IDG would not be able to obtain such consent. Should IDG ultimately obtain all requisite third party consent—and VVA has offered nothing to suggest that this will not or cannot occur—the arbitrator need take no further action. IDG would simply "enforce the DCAs as the buyer of VVA's [i]nterests," acquiring VVA's project interest and associated distributions. In this respect, the award is again distinguishable from the award in *Zaninovich*, because the issues left unresolved in that case—namely, which employees " 'had given the employer written authorization to deduct dues and initiation fees,' " and

---

[7] VVA repeatedly notes that IDG suggested to the arbitrator "only" two possible options for a remedy addressing the consent issue, neither of which the arbitrator adopted. But declining to implement a party's suggestion on how to structure a remedy does not reflect a failure to decide a submitted issue. Nor does such a suggestion restrict the arbitrator's ability to address the issue some other way.

how much of the dues and initiation fees employees actually needed to pay the union—rendered the award unenforceable under any circumstances. (See *Zaninovich*, *supra*, 86 Cal.App.3d at p. 413.)

Our reading of the award is informed by the strong policy in favor of interpreting arbitration awards in a manner that gives effect to parties' stated desire to avoid court involvement. (See, e.g., *Moncharsh, supra*, 3 Cal.4th at pp. 9–10; accord, *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 830 (*Vandenberg*).) Specifically, we must " ' "indulge every intendment to give effect to [arbitration] proceedings." ' " (*Moncharsh, supra*, 3 Cal.4th at p. 9.) In addition, in understanding the award as outlined above, we consider that arbitration is a creature of consent (see *Vandenberg, supra*, 21 Cal.4th at p. 835), and that the parties asked the arbitrator to award specific performance—rather than, for example, declaratory relief as to which party was in breach. The parties submitted this issue to the arbitrator knowing that he might not be able to determine exactly what such specific performance would ultimately look like, given that he could not know whether all third party partners would consent to IDG purchasing VVA's interest. In this way, the parties consented to the possibility of a specific performance award dependent on a factor outside of the arbitrator's control and knowledge. This is what they received. Finally, in construing the award as outlined above, we are cognizant of the California Supreme Court's admonition that "[f]ashioning remedies for a breach of contract or other injury is not always a simple matter of applying contractually specified relief to an easily measured injury" (*AMD*, *supra*, 9 Cal.4th at p. 374), and that "[t]he choice of remedy . . . may at times call on any decisionmaker's flexibility, creativity

20

and sense of fairness. In private arbitrations, the parties have bargained for the relatively free exercise of those faculties."[8] (*Ibid.*)

The dissent argues that our interpretation of the arbitrator's award as retaining jurisdiction renders it interlocutory, and that the judgment enforcing the award is therefore nonappealable. We disagree for largely the same reasons we outline above in rejecting VVA's contention that the award is incomplete, mindful also of the fact that " 'in doubtful cases the doubt should be resolved in favor of the right [to appeal] whenever the substantial interests of a party are affected by a judgment.' " (*Koehn v. State Board of Equalization* (1958) 50 Cal.2d 432, 435 ["[t]he policy of the law is to recognize a right to review the judgment of a lower court if not prohibited by law"].)

---

[8] With these same principles in mind, we are not persuaded by VVA's argument that the "past-tense" language in the award—for example, that IDG is "deemed to have purchased" VVA's interest as of May 19, 2014—is inconsistent with the arbitrator retaining jurisdiction.

Nor are we concerned by VVA's posited scenario, in which retention of jurisdiction without a time limit leaves the parties in a perpetual state of limbo. As a practical matter, both RBC and IDG have independent economic interests in resolving the issue of consent. IDG can return to the arbitrator if IDG and RBC reach an impasse. (RBC cannot seek such recourse in the same way, given that it is not a party to the arbitration.) Finally, any inconvenience created by the lack of a deadline for resolving the consent issue is at least partially a problem of the parties' own making, given that they requested a specific performance remedy from the arbitrator.

21

As a preliminary matter, that an otherwise final judgment reserves continuing jurisdiction for the court or an arbitrator to address particular issues does not automatically render that judgment interlocutory or nonappealable.  (See, e.g., *Rosenquist v. Haralambides* (1987) 192 Cal.App.3d 62, 68–69 [arbitral award that reserved jurisdiction to determine the amount of attorneys fees "served to settle the entire controversy between the parties" and reviewed on appeal]; *Eldridge v. Burns* (1978) 76 Cal.App.3d 396, 403 & 405 [judgment concluding that "defendants were entitled to recover attorney's fees for nonjudicial foreclosure in the principal action" was appealable despite court's retention of equitable jurisdiction to consider "issues . . . which may arise prior to the foreclosure sale, including attorneys fees, questions regarding the assessments and other matters"];  *Exxon Mobil Corp. v. County of Santa Barbara* (2001) 92 Cal.App.4th 1347, 1351–1352 [in tax refund cases, an order directing the assessment appeals board to apply a different valuation methodology and redetermine value is appealable, even if the trial court retains jurisdiction to review the board proceedings]; *Goodman v. Community S. & L. Assn.* (1966) 246 Cal.App.2d 13, 20 [judgment ordering damages to purchasers of apartment house complex for vendor's breach of contract and reserving jurisdiction to make further orders regarding mechanics' and materialmen's liens was "final appealable judgment"]; see also *Jackson v. Cintas Corp.* (11th Cir. 2005) 425 F.3d 1313, 1315 ["order compelling arbitration and dismissing a complaint, but retaining jurisdiction over a motion for sanctions, is a final and appealable decision"].)

A judgment resulting from an arbitration award is appealable pursuant to the same rules governing any "judgment

in a civil action of the same jurisdictional classification." (§ 1287.4 ["[i]f an award is confirmed, judgment shall be entered in conformity therewith" and "is subject to all the provisions of law relating to[ ] a judgment in a civil action of the same jurisdictional classification"]; § 1294.2 [appeal from judgment resulting from arbitration award "shall be taken in the same manner as an appeal from an order or judgment in a civil action"].) We apply these rules and conclude that the judgment resulting from the award here is appealable, because it is a final judgment that, under the circumstances that existed at the time the arbitrator issued it, finally resolved all issues between the parties. (See *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 9 ["judgment that leaves no issue to be determined except the fact of compliance with its terms is appealable"]; see *Doudell v. Shoo* (1911) 159 Cal. 448, 453 ["judgment is final 'when it terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined' "].) As previously noted, at the time the arbitrator issued the award, RBC had not refused to consent. As long as that circumstance does not change, the award will remain a final resolution of all issues between the parties. In this respect, the remedy in the award is only potentially incremental—and nothing in the record makes that potential "likely" to materialize. (Cf. *Hightower, supra*, 86 Cal.App.4th at p. 1427 [reviewing an order denying motion to vacate arbitration award where award "specified that the arbitrator reserved jurisdiction to determine a number of specific additional issues *likely* to arise" following implementation of the partial award] (italics added & omitted).) Thus, under the facts presented to the arbitrator (and this court),

nothing "further in the nature of judicial action on the part of the court is *essential* to a final determination of the rights of the parties." (*Lyon v. Goss* (1942) 19 Cal.2d 659, 670, italics added.)

Should circumstances change—that is, should RBC refuse to consent—the parties can return to the arbitrator for guidance on how to implement the terms of the award. If this results in another award imposing terms different from those set forth in the current award, the judgment or order implementing (or refusing to implement) such an additional award will be subject to appellate review under section 1286, subdivision (d) or subdivision (e), or by application for an extraordinary writ. Whether such review will be necessary is a question for another day, however, because it derives from purely hypothetical facts. For now, we must work with the facts in the current record. We see no reason not to review a judgment implementing an award that, based on that record, finally addresses all claims between the parties. Put differently, we will not delay appellate review on the basis that the circumstances at the time of the initial award might, but are not necessarily likely to, change.

## 2. *The Arbitrator Acted Within His Authority When He Awarded the Remedy Set Forth in the Partial Final Award*

VVA next argues that the arbitrator exceeded his authority by awarding IDG an interest in the project as of a closing date before IDG had obtained all third party consent, as well as cash distributions based on that same pre-consent closing date. We disagree.

24

###### a. *The remedy in the partial final award is rationally related to the arbitrator's interpretation of the DCAs*

In *AMD*, the California Supreme Court described the analysis in which a court may engage to ascertain whether or not an arbitrator "exceed[s] [his] powers" by awarding a particular remedy. (*AMD, supra*, 9 Cal.4th at p. 373.) Namely, "[t]he critical question with regard to remedies [in an arbitration award] is not whether the arbitrator has rationally interpreted the parties' agreement, but whether the remedy chosen is rationally drawn from the contract as so interpreted." (*Id.* at p. 377.) "Were courts to reevaluate independently the merits of a particular remedy, the parties' contractual expectation of a decision according to the arbitrators' best judgment would be defeated." (*Id.* at p. 375.) Thus, in reviewing an arbitration award, a court may review only to assure the arbitrator's interpretation provides the basis for the remedy awarded. "In close cases, the arbitrator's decision must stand." (*Id.* at p. 381; see *ibid.* ["[t]he award will be upheld so long as it was even arguably based on the contract"].)

Applying this deferential standard here, we must first discern the arbitrator's interpretation of the DCAs and LPAs. (See *AMD, supra*, 9 Cal.4th at p. 381.) Although the record does not contain an express statement by the arbitrator in this regard, an arbitrator's interpretation of a contract may be "implied in the award itself." (*Ibid.*) Based on the award granting IDG rights as a buyer under the buy-sell without expressly addressing third party consent, we may infer one of two possible DCA interpretations by the arbitrator: (1) that the DCAs do not require third party consent to consummate a buy-sell transaction

25

at all, or (2) that the DCAs require a buyer in a buy-sell transaction to obtain third party consent *as part of the buyer enforcing its rights* in a buy-sell transaction, such that third party consent is a prerequisite to consummating the change of ownership that may result from a buy-sell transaction, but not a prerequisite to obtaining rights as a buyer in such a transaction. We conclude the arbitrator interpreted the DCAs in the latter manner, as it is most reasonable when viewed in light of the award terms, the record of the parties' discussions regarding third party consent during arbitration proceedings, and "a plausible theory of the contract's general subject matter, framework, [and] intent." (*Id.* at pp. 362–363.)

We next consider whether the remedies in the partial final award are rationally related to the arbitrator's implied interpretation of the DCAs and his finding of breach. (*AMD, supra*, 9 Cal.4th at pp. 362–363.) We conclude that they are. Specifically, permitting IDG to enforce rights as a buyer under the buy-sell as of a May 19, 2014 closing date is a remedy "rationally drawn from the arbitrator's conception of the contract's subject matter," which, as discussed above, does not deem third party consent to be a prerequisite to awarding such rights. (*Id.* at p. 384.) Awarding IDG possession of the cash distributions to which a buyer would be entitled as of that closing date—on a potentially temporary basis, pending resolution of the third party consent issue—is likewise rationally drawn from the arbitrator's interpretation of the DCAs implied in the award.[9]

---

[9] Whether the arbitrator was wise or efficient in awarding cash distributions to IDG on a potentially temporary basis is not germane to whether the lower court correctly confirmed the award. (See Discussion *ante*, part B.2.b.)

We find further support for this conclusion when we consider that, had the arbitrator *postponed* any award to IDG until the third party consent issue was resolved (as VVA argues the DCAs require), VVA would have been permitted to retain the projects and cash distributions in the interim. But trusting VVA to act as a stakeholder in this manner is inconsistent with the arbitrator's finding that VVA had breached the agreement. Thus, as between VVA and IDG, choosing IDG to act as the stakeholder bears a more rational relationship to the arbitrator's breach determination as well. Therefore, under the applicable standard set forth in *AMD*, the arbitrator did not exceed his authority by awarding the remedies reflected in the partial final award, as we understand it.

> **b.** ***The partial final award does not contain a remedy prohibited by the DCAs***

VVA next argues that *AMD*'s rational relationship standard does not apply, because the DCAs expressly prohibit the remedy awarded. VVA is correct that the rational relationship standard applies only "in the absence of more specific restrictions in the arbitration agreement" prohibiting the remedy awarded. (*AMD*, *supra*, 9 Cal.4th at p. 367.) But VVA identifies no such express contractual prohibitions that would trigger this exception here. Nothing in the DCAs prohibits the *remedies* the arbitrator actually awarded to IDG: specific performance (recognizing IDG's rights as a buyer under the buy-sell transaction) and damages (cash disbursements to IDG as the buyer). (See, e.g., *San Francisco Housing Authority v. Service Employees Internat. Union, Local 790* (2010) 182 Cal.App.4th 933, 948 (*San Francisco Housing*) ["the remedy awarded here was not expressly forbidden

27

or prohibited by either the arbitration agreement or by the submission," and thus was not outside the scope of arbitrator's authority].)

Nevertheless, VVA argues more broadly that, because VVA interprets the DCAs as making third party consent an absolute prerequisite to enforcing rights under a buy-sell transaction, the DCAs prohibited the arbitrator from granting IDG any such rights before all third parties had consented and/or without making those rights expressly contingent on obtaining such consent. As discussed above, however, we understand the arbitrator to have interpreted the DCAs differently with respect to third party consent. Thus, at base, VVA's argument is that the arbitrator incorrectly interpreted the DCAs, and that the remedy in the partial final award is inconsistent with VVA's preferred "correct" interpretation. This is not a basis for vacatur.

Courts must defer to an arbitrator's assessment of the merits—here, the interpretation and enforcement of the DCAs. (*AMD, supra*, 9 Cal.4th at p. 372.) The parties "empowered [the arbitrator] to interpret and apply the parties' agreement to the facts he found to exist" (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1185 (*Gueyffier*); *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1360 (*Cable Connection*)), and California law does not permit a court to correct even what may appear to be obvious errors in such interpretation. (*Moncharsh, supra*, 3 Cal.4th at pp. 6, 28 & 33.) This broad deference derives from the fact that " ' " [t]he arbitrator's resolution of [contested issues of law or fact] is what the parties bargained for in the arbitration agreement.' " ' " (*Cable Connection, supra,* 44 Cal.4th at pp. 1360–1361.) Parties to an arbitration agreement "accept the risk of legal error in

28

exchange for the benefits of a quick, inexpensive, and conclusive resolution." (*Id*. at p. 1360.) That the arbitrator's authority and remedial power are defined (in part) through a cross-reference to the DCAs generally does not transform interpretation of the DCAs into a proper basis for vacating an arbitration award. (See *O'Malley v. Wilshire Oil Co.* (1963) 59 Cal.2d 482, 493 [contractual clause precluding arbitrator from modifying contract did not permit court to reach merits of controversy in deciding limits of arbitrability]; see, e.g., *Harris v. Sandro* (2002) 96 Cal.App.4th 1310, 1314 [argument that arbitrator "exceeded his powers by issuing . . . 'inconsistent' rulings" was "nothing more than a claim that the arbitrator erred in a legal ruling," which cannot provide a basis for vacatur]; *AMD*, *supra*, 9 Cal.4th at p. 373.) Thus, regardless of the merits of VVA's proposed alternative interpretation of the DCAs, as long as the arbitrator's interpretation is rationally related to the remedy, the arbitrator did not exceed his authority in awarding it.

VVA cites *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044 (*O'Flaherty*), which appears to hold that a remedy "inconsistent with the terms of a contract"—as the court interprets them—is a remedy effectively prohibited by the contract, and thus one that exceeds the bounds of the arbitrator's jurisdiction. We read this case as limited to its very unique facts, as have several other courts.

In *O'Flaherty*, Division 5 of this court stated the following: "By providing a remedy inconsistent with the provisions of the partnership agreement and specifically in contradiction to the partnership agreement provision that the arbitrator has no power to order a remedy prohibited by the agreement or not available in a court of law, the arbitrator in effect awarded

29

'a remedy expressly forbidden by the arbitration agreement.' [Citation.]  In view of the arbitrator's acts in excess of his power and jurisdiction, the warnings in [*Moncharsh*] and [*AMD*] concerning the limitations on judicial power over arbitration awards are not applicable." (*O'Flaherty, supra*, 115 Cal.App.4th at p. 1061.)

But the facts in *O'Flaherty* do not require such a broad statement of the law.  *O'Flaherty* concluded that the forfeiture remedy the arbitrator ordered for wrongful withdrawal from a partnership agreement exceeded his authority, because "[t]he partnership agreement does not provide for forfeiture of a partner's capital account in the event the partner wrongfully withdraws against the firm or upon involuntary termination of a partner for cause.  To the contrary, the agreement provides for a return of capital, even to a wrongfully withdrawing partner." (*O'Flaherty*, *supra*, 115 Cal.App.4th at pp. 1057–1058.) Therefore, in *O'Flaherty*, unlike here, the contract at issue expressly addressed the specific remedies permitted and provided an exhaustive list of such remedies, a list that did not include the forfeiture remedy awarded in arbitration.  (See *ibid.*)  This is not the same thing as a remedy being generally "inconsistent with the [contract]." (*Id*. at p. 1060.)

The California Supreme Court and several appellate courts have distinguished *O'Flaherty* on this basis, limiting its seemingly broad holding to the unique facts involved.  In *Gueyffier*, for example, the California Supreme Court noted that the award in *O'Flaherty*, "contravene[d] an express, unambiguous limitation in the contract itself" (*Gueyffier*, *supra*, 43 Cal.4th at p. 1187), and that "[a]bsent an express and unambiguous limitation in the contract or the submission to arbitration,

30

an arbitrator has the authority to find the facts, interpret the contract, and award any relief rationally related to his or her factual findings and contractual interpretation." (*Id*. at pp. 1181-1182 [concluding that an arbitrator does not "exceed his powers when he applies equitable defenses to excuse a party from performing a material condition of the agreement that provides the arbitrator may not modify or change any of the agreement's material provisions"]; accord, *San Francisco Housing, supra*, 182 Cal.App.4th at pp. 949 & 951.) For example, in *San Francisco Housing,* the Court of Appeal explained that, "[u]nlike the remedies in the foregoing cases [including *O'Flaherty*], the remedy imposed by the arbitrator . . . did not conflict with clear and explicit language of the [underlying contract]. Rather, the arbitrator's interpretation of the contract allowed her to frame a remedy that, although not expressly provided for . . . , was, nevertheless, reasonably related to the arbitrator's interpretation of the contract and was not expressly prohibited by it." (*Id*. at p. 951.) So, too, here.

Thus, the arbitrator here was acting well within his authority under prevailing precedent when he awarded the remedies at issue. Our state Supreme Court has expressly rejected the type of arguments VVA raises to the contrary.

We further note, VVA's argument is not only plainly incorrect under the applicable law, it is also patently unfair. Were we to accept, as VVA suggests, that third party consent is a prerequisite to the arbitrator having authority to award IDG a specific performance remedy, VVA would enjoy a "heads I win, tails you lose" scenario in this arbitration. Namely, if the arbitrator concludes VVA did *not* breach the DCAs, VVA keeps the project and cash distributions; if the arbitrator concludes

31

VVA *did* breach the DCAs, VVA *still* keeps the project and cash distributions, because the arbitrator is, according to VVA, without authority to issue any remedy requiring otherwise. Under VVA's arguments, VVA prevails in practice, regardless of whether or not it breached.

     **3.**     ***The Court's Refusal to Consider Certain Impeachment Documents and Testimony Discovered After the Close of Evidence in Arbitration Did Not Substantially Prejudice VVA or Render the Proceedings Unfair***

VVA's final argument for vacatur stems from the arbitrator's denial of VVA's motion to reopen the arbitration to consider newly discovered evidence related to Downs's credibility. VVA's motion identified two categories of credibility evidence produced in separate proceedings after the close of evidence in this arbitration.

First, it identified documents contradicting Downs's arbitration testimony regarding the circumstances surrounding termination of Downs's partnership at the law firm Nixon Peabody. Specifically, these documents contradict Downs's arbitration testimony that he could have remained a partner at Nixon Peabody without divesting his interest in Highland, and that his leaving the firm was unrelated to his interest in Highland. Second, VVA's motion identified Downs's deposition testimony admitting that he had issued multiple opinion letters that included false statements regarding Highland's and Rice's affordable housing transactions. Specifically, Downs testified that he had sent these letters to state and federal agencies and federally-insured financial institutions—either directly (by signing the letter) or indirectly (by being a partner at the

32

firm preparing the letter)—and that the letters inaccurately stated Downs's firms had "acted as counsel to" Highland members, including Rice individually.

The arbitrator denied VVA's motion on the basis that "[t]he evidence which VVA seeks to present at a re-opened [h]earing is wholly collateral to what the parties contested in this Arbitration"—the meaning, performance, and breach of the buy-sell agreement—and that "[w]hether Downs violated the Rules of Professional Responsibility or certain criminal statutes is not for the Arbitrator to decide."

The arbitrator further noted that "even if VVA's proffered evidence had been presented at the [h]earing, the Arbitrator would have sustained IDG's inevitable relevance objection."

To vacate an award based on an arbitrator's "refusal . . . to hear evidence material to the controversy," section 1286.2, subdivision (a)(5), requires that the trial court find a party has been "substantially prejudiced" by the refusal.  (§ 1286.2, subd. (a)(5).)  "To find substantial prejudice the court must accept, for purposes of analysis, the arbitrator's legal theory and conclude that the arbitrator might well have made a different award had the evidence been allowed."  (*Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 439 (*Hall*).)  The record here supports no such conclusion.

First, the arbitrator did not arbitrarily refuse to hear the evidence at issue without considering its relevance.  The arbitrator's denial of VVA's motion to reopen was partially based on the arbitrator's view of the evidence as irrelevant; he noted that, were he to reopen proceedings and consider it, he ultimately would have "sustained IDG's inevitable relevanc[y] objection." Had the arbitrator excluded this evidence as irrelevant during

33

the course of the arbitration hearing, the Code of Civil Procedure would not have permitted the trial court to review the correctness of that determination. For the same reasons, a court is not empowered to vacate an award based on the arbitrator's refusal to reopen proceedings for the purpose of considering evidence the arbitrator deems irrelevant. No procedural unfairness arises— let alone procedural unfairness at the level that might justify vacatur—simply because the arbitrator was presented with and assessed the relevance of the evidence after the hearing concluded, as opposed to before.

The Court of Appeal reached a similar conclusion in *Hall*. There, "[t]he arbitrator received an informal offer of proof, determined that even if presented the evidence would not persuade him against the [non-moving parties], and denied [the moving party] the opportunity to replace his offer of proof with actual testimony." (*Hall, supra*, 18 Cal.App.4th at p. 439.) Under such circumstances, "[t]he arbitrator did not prevent [the moving party] from fairly presenting his defense"; rather, the arbitrator concluded that this "defense, even with the proffered evidence, lacked merit." (*Ibid.*) As a result, the award could not be vacated. (*Ibid.*) Similar reasoning prevents us from vacating the award here.

Moreover, even if the arbitrator in this case had *not* made such a relevance finding, the record would still support the trial court's conclusion that this evidence would not have affected the arbitrator's assessment of Downs's and Rice's relative credibility. In the interim award and partial final award, the arbitrator found Downs to be credible, and Rice to be not credible, and described in some detail the bases for these determinations. For example, he found Downs's testimony "understated[,] . . . careful,"

34

and "consistent." The arbitrator found that Rice, by contrast, "was not a credible witness" for several reasons. Specifically, the arbitrator noted that Rice "frequently contradicted himself and made many unbelievable statements." The arbitrator also noted that "Rice's conduct before this particular dispute arose further eroded his credibility," as did Rice's efforts to "portray himself as a victim of Downs'[s] superior real estate experience," that he "blamed his former attorney . . . in order to evade responsibility for" a finding in earlier proceedings that Rice had "knowingly [made] false statements," and his "unconvincing[ ]" efforts "to avoid admitting" to having made certain potentially offensive statements.

The arbitrator thus based his credibility assessment on several factors, including the two witnesses' demeanors while testifying, and ultimately found Downs to be significantly more credible than Rice. Given this, the court correctly concluded that the excluded impeachment materials would not have tipped the scales in Downs's favor during arbitration, such that its exclusion "substantially prejudiced" VVA.

VVA contends that, particularly following the California Supreme Court's recent decision in *Heimlich v. Shivji* (2019) 7 Cal.5th 350 (*Heimlich*), the proper focus in assessing whether an arbitrator's refusal to consider evidence provides a basis for vacatur is whether the refusal to hear evidence calls into question the fundamental fairness of the proceeding by effectively denying one side the opportunity to be heard. (See *id.* at pp. 368-369.) We do not disagree, but VVA's argument fares no better when the analysis is phrased in these terms.

Section 1286.2 subdivision (a)(5) acts as a " 'safety valve' " that allows us " 'to intercede when an arbitrator has prevented

35

a party from fairly presenting its case.' " (*Heimlich, supra,* 7 Cal.5th at pp. 368–369, quoting *Hall*, *supra*, 18 Cal.App.4th at p. 439.) This requires inequity of the kind not present here. For example, the California Supreme Court identified *Royal Alliance Associates, Inc. v. Liebhaber* (2016) 2 Cal.App.5th 1092, 1108, as a "paradigmatic example" of such inequity. (*Heimlich, supra*, 7 Cal.5th at p. 369.) Specifically, the Supreme Court noted that, in *Royal Alliance Associates*, " '[t]he arbitrators gave [one party] an unfettered opportunity to bolster the written record but denied [the other party] even a limited chance to do the same' " (*ibid.*, quoting *Royal Alliance Associates, supra,* 2 Cal.App.5th at p. 1110), and the record suggested the arbitrators did so because "[they] may have felt [themselves] too busy to allow each side the opportunity to present evidence." (*Heimlich, supra*, at p. 369; see *Royal Alliance Associates, supra*, at p. 1099.) The record here reflects no such arbitrary one-sidedness. Thus, the court did not err in concluding that subdivision (a)(5) of section 1286.2 did not provide a basis for vacating the award.

In sum, because none of the narrow bases on which a court may vacate an arbitration award applies, the trial court did not err in confirming the award.

## DISPOSITION

The trial court's judgment and orders are affirmed.  IDG is entitled to its costs on appeal.

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>.


ROTHSCHILD, P. J.

I concur:


BENDIX, J.

CHANEY, J., Dissenting

I agree with VVA's contention that the arbitrator exceeded his power. I would reverse the trial court's judgment on that basis.

## A.     The Arbitrator Exceeded His Authority

"On petition of a party to an arbitration [citations], the superior court is to vacate an arbitrator's award if '[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted.' [Citation.] As [the Supreme Court has] explained in prior cases, however, this provision does not supply the court with a broad warrant to vacate awards the court disagrees with or believes are erroneous.

"When parties contract to resolve their disputes by private arbitration, their agreement ordinarily contemplates that the arbitrator will have the power to decide any question of contract interpretation, historical fact or general law necessary, in the arbitrator's understanding of the case, to reach a decision. [Citations.] Inherent in that power is the possibility the arbitrator may err in deciding some aspect of the case. Arbitrators do not ordinarily exceed their contractually created powers simply by reaching an erroneous conclusion on a contested issue of law or fact, and arbitral awards may not ordinarily be vacated because of such error, for ' "[t]he arbitrator's resolution of these issues is what the parties bargained for in the arbitration agreement." ' [Citations.]

"An exception to the general rule assigning broad powers to the arbitrators arises when the parties have, in either the contract or an agreed submission to arbitration, explicitly and unambiguously limited those powers. [Citation.] 'The powers of

an arbitrator derive from, and are limited by, the agreement to arbitrate. [Citation.] Awards in excess of those powers may, under sections 1286.2 and 1286.6, be corrected or vacated by the court.' [Citation.] The scope of an arbitrator's authority is not so broad as to include an award of remedies 'expressly forbidden by the arbitration agreement or submission.' [Citation.]"[1] (*Gueyffier v. Ann Summers, Ltd.* (2008) 43 Cal.4th 1179, 1184-1185.)

"Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.] The remedy awarded, however, must bear some rational relationship to the contract and the breach. The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent. [Citation.] The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator).[2] Where the damage is difficult to determine or measure, the arbitrator enjoys correspondingly broader discretion to fashion a remedy. [Citation.] [¶] The award will be upheld so long as it was even

---

[1] The arbitration agreement at issue here expressly limits the arbitrator's power: "The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement *nor to grant any remedy which is either prohibited by the terms of this Agreement*, or not available in a court of law." (Italics added.)

[2] "The award is rationally related to the breach if it is aimed at compensating for, or alleviating the effects of, the breach. . . .

arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source. [Citations.] In close cases the arbitrator's decision must stand." (*AMD*, *supra*, 9 Cal.4th at p. 381, original italics.) "Consequently, the dispositive question before us is whether the remedy imposed by the arbitrator was 'even arguably based on the contract' [citation] or, stated otherwise, whether the award ' "conflicts with express terms of the arbitrated contract." ' " (*San Francisco Housing Authority v. Service Employees International Union, Local 790* (2010) 182 Cal.App.4th 933, 945.)

The arbitrator concluded that IDG established VVA's breach of an agreement "formed by the DCAs, the Buy-Sell Notice[,] and [VVA's] Notice of Election" to purchase IDG's interests in Villa Vasona and Twin Oaks. The arbitrator concluded that IDG was entitled to specific performance of the agreement formed by those three documents, and "order[ed] VVA to sell its Interests to IDG on the terms and conditions set forth in the Buy-Sell, *effective on the May 19, 2014 closing date*. The DCAs also require that VVA pay IDG its entitled share of Distributable Cash, which is 33.33% of the amount that accrued prior to the May 19th Buy-Sell closing date and 100% of the Distributable Cash accruing since that closing date, *when IDG is deemed to have purchased VVA's interests*." (Italics added.)

A May 19, 2014 closing date for the parties' agreement conflicts with the express terms of an agreement based on the DCAs, the buy-sell notice, and VVA's notice of election—by *any* measure. Under the "Closing" heading in the DCAs, those agreements specified that "closing . . . of the purchase and sale of any Interest pursuant to this Mandatory Buy-Sell shall take

3

place on the conditions and date identified in the Buy-Sell Notice delivered by the Offering Party, but not later than ninety (90) days after the delivery of the Buy-Sell Notice." The buy-sell notice specified that the transaction would close on the "[l]ater of 90 days following the date of this Buy-Sell Notice *or receipt of last of consents required under* [*each property's*] [o]perating agreement." (Italics added.) And VVA could transfer or assign its interests in the properties "*only with the prior written Consent* of [RBC] in its sole discretion." (Italics added.) Even without reference to the LPAs, the DCAs' "Limitation of Buy-Sell Rights" provision states that "no party shall have the right to exercise the Mandatory Buy-Sell" if the transaction would run afoul of RBC's consent rights.

The arbitrator was aware of this issue before he issued his interim award. The issue was raised again between the interim award and the partial final award. The issue was raised again when the trial court sought clarification of the award from the arbitrator. At each turn, the arbitrator declined—in one instance expressly—to account for the fact that RBC's *prior* consent was necessary for VVA to transfer its interests in Villa Vasona and Twin Oaks. The parties agree that RBC never gave the required consent, and the arbitration award makes no allowance for the consent or the possibility that RBC might withhold it. The effect of the arbitration award is that IDG and VVA are suspended in an impregnable dilemma created by an arbitration award that VVA cannot comply with because it cannot force RBC—a nonparty to the arbitration—to consent to the transfer, and that IDG cannot enforce for the same reason.

IDG argued in the trial court as it does here that the arbitrator's language means only that there is a possibility of the

4

transfer happening at some point in the future *if* RBC grants the required consent. No reasonable interpretation of the arbitrator's award would permit that understanding. The arbitrator clearly stated that the buy-sell agreement was deemed to have *closed* and VVA's interests in Villa Vasona and Twin Oaks were deemed to *have passed* to IDG *three years before the award*. Something that can only happen once and that *did* happen three years ago is not something that *might* happen in the future *if* a necessary contingency occurs. IDG's contentions that the arguments here are simply arguments about damages that should be left to the arbitrator's discretion fail for the same reason. It is not the case that the arbitrator made a determination about an amount of damages or a type of damages that was within his purview; this is the case where the remedy itself is expressly prohibited by the contract.

It is obvious from the arbitrator's award that he intended to award IDG specific performance of the buy-sell agreement. It is equally obvious that he awarded something *different* than specific performance; something that failed to account for a variety of terms of the parties' agreements. Under the express terms of the parties' complex collection of interlacing agreements, *no* buy-sell transaction requiring the transfer of *VVA's* interests was *possible* absent RBC's *prior* written consent. The agreements repeatedly make that express prohibition clear. This is not the case of an ambiguous or missing term, or the *failure* of the parties' agreements to *expressly* prohibit a particular occasion; the parties agreed that the remedy at the center of the arbitrator's award is something that *could not happen under any set of circumstances*.

"The arbitrator cannot shield his decision from scrutiny 'simply by making the right noises—noises of contract

5

interpretation . . . .' [Citation.] Rather, the question [must be] whether the award is 'so *outré* that we can infer that it was driven by a desire to do justice beyond the limits of the contract.' [Citation.] Restated, the test asks ' "whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement." ' " (*AMD*, *supra*, 9 Cal.4th at p. 380.) Our Supreme Court has stated that "arbitrators may not award remedies expressly forbidden by the arbitration agreement or submission . . . . How the violation of ' "an express and explicit restriction on the arbitrator's power" ' [citation] could be considered rationally related to a plausible interpretation of the agreement is difficult to see." (*Id.* at pp. 381-382.)

Code of Civil Procedure section 1286.2 provides litigants with limited review of arbitration awards. We have today made them unreviewable.

Because the terms of the parties' agreement and an award in 2017 granting a transfer of VVA's interests on May 19, 2014 absent RBC's consent are mutually exclusive, I would conclude the arbitrator's award is not rationally related to the parties' contract and the arbitrator exceeded his power. I would order the trial court to vacate the arbitration award.

## B. If the Arbitrator Retained Jurisdiction, The Appeal Must be Dismissed

### 1. The Arbitrator did not Retain Jurisdiction

The arbitrator *could have* retained jurisdiction in his partial final award to determine any issues that arose afterward. (See *Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1427 (*Hightower*).) He did not.

6

The arbitrator issued his award on May 19, 2017. The award does not state on its face that the arbitrator is retaining jurisdiction for any purpose. The parties were unable to enforce the award and returned to the arbitrator to discuss the question of retained jurisdiction more than three months later on August 25, 2017. The arbitrator explained during that hearing that when he issued his May 19 award, he had no intention "one way or the other" of retaining jurisdiction.

On September 11, 2017, the trial court issued its order requesting the arbitrator's clarification of the award. VVA argued to the arbitrator that he had *not* retained jurisdiction over the matter, and in a September 21, 2017 letter to the arbitrator, IDG *agreed*. IDG "concede[d] that, as VVA has argued, the Arbitrator did not retain jurisdiction over this matter. The Award does not state that the Arbitrator retains jurisdiction. [Citation.] As the Arbitrator stated on the record, the Award is a 'partial' award only because the disputes among other parties in the same arbitration have not yet been addressed."

### 2. If the Arbitrator Retained Jurisdiction, then the Trial Court's Judgment is Not Appealable

*If the arbitrator retained jurisdiction, then we have no jurisdiction to hear this appeal.*

The relief sought and granted in *Hightower*, upon which we relied to find that the arbitrator's post-award retention of jurisdiction to conclude that the arbitrator's award here created an "incremental award process," was a peremptory writ of mandate. (*Hightower, supra*, 86 Cal.App.4th at p. 1440.) If the arbitrator retained jurisdiction to continue to decide disputes between the parties, "any partial award . . . would be subject to confirmation. Upon such confirmation, it [would] be appropriate

7

for the trial court to issue an interlocutory judgment establishing, in accordance with the terms of such award, the issues and matters resolved thereby and providing a basis and means for the judicial enforcement thereof. [Citation.] *Appellate relief from such judgment, as is true with respect to interlocutory judgments generally, would be available by application for an extraordinary writ.* The granting of appellate relief at this stage, however, would, as in all such cases, require a proper showing of justification for immediate appellate intervention; in other words, the aggrieved party would have to make a demonstration as to why an appeal from the judgment confirming the ultimate final award would not be adequate. [Citation.]" (*Ibid.*, italics added.)

"Under the one final judgment rule, interlocutory judgments generally are not appealable." (*Kaiser Foundation Health Plan, Inc. v. Superior Court* (2017) 13 Cal.App.5th 1125, 1138.) "The one final judgment rule applies to judgments confirming arbitration awards." (*Id.* at p. 1139.) *If* we construe the arbitrator's award as confirmation of one part of an "incremental award process," the "judgment confirming the partial final award is not a final judgment, it is not appealable . . . ." (*Id.* at p. 1140.) In that event this court would lack jurisdiction to hear this appeal.

8

Based on the contractual prohibition of the remedy the arbitrator awarded and the conclusion that the arbitrator was engaged in an incremental award process, which renders the trial court's judgment interlocutory and deprives us of jurisdiction, I respectfully dissent.


CHANEY, J.